UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ANTHONY TRUESDALE,

                              Plaintiff,

         v.                                              No. 9:02-CV-0135
                                                         (GLS/GHL)
D. LUTHER, Correction-Officer;  J. MCNAMARA,
Correction-Sargent; W. CONNOLLY, Deputy-
Superintendent of Security; N. BEZIO, Correction-
Captain; R.J. MURPHY, Deputy-Superintendent for
Disciplinary-Programs,

                              Defendants.
_____

APPEARANCES:                                             OF COUNSEL:

ANTHONY TRUESDALE, 95-A-2274
Plaintiff, *Pro Se*
Wende Correctional Facility
3622 Wende Road
Alden, NY 14004-1187

HON. ELIOT L. SPITZER                                    JEFFREY P. MANS, ESQ.
Attorney General for the State of New York               Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION

_____This matter has been referred to me for Report and Recommendation by the Honorable

Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

N.D.N.Y. 72.3(c).  In this civil rights complaint brought under 42 U.S.C. § 1983, Plaintiff (a

prisoner) generally alleges that Defendants (five employees of Sing Sing Correctional Facility or

Upstate Correctional Facility) violated his First and Fourteenth Amendment rights by (1) issuing

him a fabricated misbehavior report and transferring him to another prison, in retaliation for his refusal to participate in an inner-prison investigation of a scheduled work shut down by prisoners, (2) depriving him of due process of law at the resulting disciplinary hearing and appeal therefrom, and (3) causing the denial of his access to the courts during his confinement in a punitive segregation unit, where his legal papers were confiscated and/or destroyed and his access to legal materials and legal assistance was reduced.  (Dkt. No. 1.)  As a result, Plaintiff seeks compensatory and punitive damages in the amount of $1.7 million.  (*Id*.)

Currently before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 33.)  Defendants' motion, which Plaintiff has opposed (Dkt. No. 46), raises six issues: (1) whether Defendants are entitled to qualified immunity; (2) whether Plaintiff has stated a First Amendment claim for denial of access to the courts; (3) whether Plaintiff has stated a claim for property deprivation; (4) whether Plaintiff has stated a claim for retaliation; (5) whether, with regard to Plaintiff's confinement in a Special Housing Unit, he has a protected liberty interest under the Fourteenth Amendment; and (6) whether there was a due process violation at Plaintiff's disciplinary hearing or during his administrative appeal.  (Dkt. No. 33.)

For the reasons discussed below, I reach the following conclusions: (1) Defendants are entitled to qualified immunity; (2) Plaintiff has failed to state a First Amendment claim for denial of access to the courts; (3) Plaintiff has failed to state a claim for property deprivation; (4) Plaintiff has failed to state a claim for retaliation; (5) with regard to Plaintiff's confinement in a Special Housing Unit, there is a material question of fact regarding whether he has a protected liberty interest under the Fourteenth Amendment; and, (6) there was no due process violation at Plaintiff's disciplinary hearing or during his administrative appeal.

2

As a result, I recommend that Defendants' motion for summary judgment be granted in its entirety.

## DISCUSSION

Plaintiff Anthony Truesdale ("Plaintiff"), who is proceeding *pro se*, alleges that Defendants deprived him of his First and Fourteenth Amendment rights in the following six ways:

1.      Defendant D. Luther, a Correction Officer at Sing Sing Correctional Facility, and Defendant J. McNamara, a Correction Sergeant at Sing Sing Correctional Facility, filed and co-signed (respectively) "a fabricated misbehavior-report [against plaintiff] in retaliation for the plaintiff['s] failing to cooperate in an alleged departmental-investigation" of "an alleged work . . . and program stoppage, supposively [sic] scheduled for January 1, 2000";

2.      Defendant W. Connolly, Deputy Superintendent of Security at Sing Sing Correctional Facility, "transfer[red] the plaintiff [to Upstate Correctional Facility's Punitive Segregation Unit] in retaliation . . . for [plaintiff's] failing to cooperate in an alleged departmental-investigation" and failed to "investigat[e] the facts surrounding the fabricated misbehavior-report";

3.      Defendant N. Bezio, a Correction Officer at Upstate Correctional Facility, arbitrarily adjudicated Plaintiff's disciplinary hearing, "fail[ed] to investigate into [sic] the facts surrounding the plaintiff's misbehavior report," "fail[ed] to call witnesses," and "fail[ed] to adjourn the disciplinary-hearing . . . to allow plaintiff an opportunity to review the requested Unusual-Incident Memorandum";

4.      Defendant R.J. Murphy, Deputy Superintendent of Disciplinary Programs at

3

Upstate Correctional Facility, "fail[ed] to investigate into [sic] the facts surrounding the plaintiff's Administrative-Appeal" and "failed to investigate into [sic] the plaintiff's claim, cause [sic] the plaintiff was confined on keep-lock status prior to the misconduct in question, and was not scheduled to be released until (9) days after the alleged resurrection [sic], and or protestation scheduled for January 1, 2000";

     5.     While in Upstate Correctional Facility's punitive segregation unit, Plaintiff lost a legal case in New York State Supreme Court, Franklin County (Index No. 2000-472), because (1) his "legal-notes" and "legal-drafts" were confiscated and/or destroyed, and (2) his access to "legal-research materials" and "legal-assistance" was reduced; and

     6.     While in Upstate Correctional Facility's punitive segregation unit, Plaintiff experienced "reduced access to legal-research materials, and legal-assistance, reduced access to rehabilitative, [sic] reduced access to educational, and work-incentive programs, together and coupled with no access to telephones, and packages."  (Dkt. No. 1.)[1]

---

[1]     Plaintiff makes several new factual assertions in his Opposition to Defendants' Rule 7.1 Statement and his Affidavit in Support of his Opposition to Defendants' Motion for Summary Judgment. (Dkt. No. 46.)  However, despite my responsibility to liberally construe Plaintiff's complaint, I cannot consider these new factual assertions as "allegations" that amend Plaintiff's complaint.  *See Sabey v. Local 12230 of United Steelworkers of America*, 81-80E, 1982 U.S. Dist. LEXIS 10192, *5 (W.D.N.Y.  March 12, 1982) (refusing to consider, on motion for summary judgment, Plaintiff's affidavit as amending his complaint to add a claim "by the back door"), *accord*, *Wolff v. Ford Motor Co.*, 75-CV-3390, 1977 U.S. Dist. LEXIS 16282, *13 n.2 (S.D.N.Y. Apr. 20, 1977) (citing case).

     Indeed, it would be unfairly prejudicial to Defendants, and overly burdensome to the Court, to change the landscape of Plaintiff's claims at this late stage of the proceeding, i.e., after Defendants have answered Plaintiff's complaint (Dkt. No. 12) and discovery has occurred– including the use of numerous interrogatories, requests for admissions and document requests (Dkt. No. 23, ¶ 5), and a deposition (Dkt. No. 41, Ex. A).  For this reason, even if I were to construe Plaintiff's affidavit as a motion to amend under Fed. R. Civ. P. 15(a), I would deny that motion.  *See Ansam Assoc. v. Cola Petroleum Ltd.*, 760 F.2d 442, 446 (2d. Cir. 1985) (affirming denial of motion to amend complaint filed after discovery had closed and defendants had moved

## I.      MATERIAL FACTS

The following facts are not in dispute or are viewed most favorably to Plaintiff, the non-

moving party:

1.      At the time of the facts alleged in Plaintiff's complaint, Defendant David L.

Luther was a Correction Officer at Sing Sing Correctional Facility ("C.F."); Defendant John

McNamara was a Correction Sergeant at Sing Sing C.F.; Defendant William J. Connolly was the

Deputy Superintendent of Security at Sing Sing C.F.; Defendant Norman Bezio was a Correction

Captain at Upstate C.F.; and Defendant Robert J. Murphy was the Deputy Superintendent of

Disciplinary Programs at Upstate C.F.  (*See*, *generally*, Dkt. Nos. 1 [Plf.'s Complaint], 42 [Defs.'

Rule 7.1 Statement], 46 [Plf.'s Rule 7.1 Opp.].)

2.      During the fall of 1999, while Plaintiff was an inmate at Sing Sing C.F., he was

alleged[2] by other inmates to be a leader of, and a participant in, a threatened inmate

demonstration and strike scheduled to occur on January 1, 2000 ("Y2K protest").  (Dkt. No. 42,

¶¶ 1, 13-14; Dkt. No. 46 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting this fact as

_____

for summary judgment because of prejudice to defendants); *Reisner v. General Motors Corp.*,
511 F. Supp. 1167, 1172 (S.D.N.Y. 1981) (denying motion to amend because of prejudice after
discovery had closed and motion for summary judgment had been filed, and because the Court
would have to expend additional valuable resources), *aff'd*,  671 F.2d 91 (2d Cir. 1982).  I would
also deny that motion because the deadline for such motions expired long ago.  (Dkt. No. 14 at 1
[setting deadline for motions to amend as 9/30/02].)

[2]      Defendants used the word "identified" in their Rule 7.1 Statement.  However,
because the word "identified" suggests that the other inmates' allegation was correct or accurate,
which fact Plaintiff denies, I have changed the word "identified" in Defendants' factual assertion
to the word "alleged."

required by N.D.N.Y. L.R. 7.1(a)(3)].)[3]

     3.     On December 16, 1999, Defendants Luther and McNamara signed an

Inmate Misbehavior Report, charging Plaintiff with violating Rules 104.11 and 104.12 of the

Standards of Inmate Behavior, which prohibit inmates from engaging in "any violent conduct or

conduct involving the threat of violence either individually or in a group," and from "lead[ing],

organiz[ing], participat[ing], or urg[ing] other inmates to participate in work-stoppages, sit-ins,

lock-ins, or other action which may be detrimental to the order of the facility." (Dkt. No. 42, ¶

15; Dkt. No. 46, ¶ 8 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting that the

misbehavior report was signed on December 16, 1999, only that it was "fabricated"].)  In the

misbehavior report, Defendant Luther stated the grounds on which the charges were based:

---

[3]     The closest Plaintiff comes, in his Rule 7.1 Opposition, to denying this factual assertion is when he makes the following three factual assertions: (1) that he was awakened on December 16, 1999, by Defendants Luther and McNamara and asked to cooperate with an "*alleged* Interdepartmental-Investigation'" [emphasis added]; (2) that "he did not know of an alleged resurrection [sic], and or protestation, which was supposedly scheduled for January 1, 2000," and (3) that Defendant Luther's and McNamara's December 16, 1999, misbehavior report was "fabricated." (Dkt. No. 46, ¶¶ 3-4, 8 [Plf.'s Rule 7.1 Opp.].)

     However, these three factual assertions are separate and distinct from Defendants' factual assertion that Plaintiff was indeed alleged by other inmates to be a leader of, and a participant in, the planned Y2K protest. For example, although Plaintiff was not permitted to see the confidential documents on which Defendants' factual assertion was based, he could have specifically denied, in his Rule 7.1 Opposition, the factual assertion in question. (Dkt. No. 42, ¶ 13-14.) However, Plaintiff proffered no such denial. In fact, he asserted that he feared reprisal from other prisoners if he undermined the planned Y2K protest. (Dkt. No. 46, ¶¶ 4-5 [Plf.'s Rule 7.1 Opp.].) Under the circumstances, I must deem Defendants' factual assertion admitted.

     Finally, I note that, liberally construed, Plaintiff's response papers also assert that he was "confined on keep-lock status prior to the misconduct in question, and was not scheduled to be released until (9) days after the alleged resurrection [sic], and or protestation." (Dkt. No. 1, ¶ 19; Dkt. No. 46 [Plf.'s Affid., Ex. A].) This asserted fact is immaterial for three reasons: (1) Plaintiff did not assert it in controverting Defendants' Rule 7.1 Statement; (2) it ignores that Plaintiff could have *made* the threats before he went on keep-lock status on November 27, 1999 (even though some of the threats may have been *reported* to prison officials after November 27, 1999); and (3) it ignores that Plaintiff could have made the threats from his cell.

> Information gathered in an ongoing investigation into mass
> demonstration by inmates and a proposed inmate program refusal has
> identified this inmate as participating in and urging others to
> participate in action detrimental to the order of the facility and conduct
> with the threat of violence by urging / threats toward other inmates to
> comply with 'state down' dress code in order to attend meals and
> threatening others with physical harm or damage to personal property
> if the [sic] do not participate in a mass demonstration.

(Dkt. No. 35, Ex. B; Dkt. No. 37, Ex. A; Dkt. No. 38, Ex. B; Dkt. No. 39, Ex. B; Dkt. No. 40,

Ex. B.)

    4.    On December 16, 1999, Defendant Luther wrote a memorandum to Defendant

Connolly, advising him of Plaintiff's identification as an alleged participant in the Y2K inmate

demonstration and strike, and the issuance of the December 16, 1999, misbehavior report.  (Dkt.

No. 42, ¶ 18; Dkt. No. 46, ¶ 7 [Plf.'s Rule 7.1 Opp.].)  Defendant Luther's memorandum stated:

> I have participated in an ongoing investigation into an inmate
> mass demonstration to begin on 12/1/99 with inmates "Stated Down"
> to attend meals and including an inmate program refusal planned for
> 1/1/00.  Confidential sources as well as information received by the
> facility have identified this inmate [Inmate Truesdale, A. 95A2274] as
> being actively involved in recruiting for and implementation of this
> action.  The confidential sources have identified this inmate as
> participating in unauthorized meetings in which demonstration
> instructions were given.  During these meetings instructions were
> given that force would be used to make others participate.  This inmate
> was identified as making threats to gain participation while in keeplock
> status.  A document confiscated from another of the participants states
> in part '. . . nobody is going to work or programs and any inmate who
> does is going to get it and I don't mean just stabbed he's dying for that
> shit . . .' and '. . . any police who moves on an inmate is getting it too .
> . .'.  The sources of this information are independent of each other and
> have personal knowledge of this inmate's involvement.  These sources
> wish to remain confidential.  A Misbehavior Report has been issued.

(Dkt. No. 39, Ex. D; Dkt. No. 35, Ex. D; Dkt. No. 37, Ex. D at 14.)

    5.    On December 17, 1999, Plaintiff was confined to Sing Sing C.F.'s disciplinary

Special Housing Unit ("SHU") as a result of the December 16, 1999, misbehavior report.  (Dkt. No. 42, ¶ 17; Dkt. No. 46, ¶ 7 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting that his confinement in SHU was the result of the misbehavior report].)

6.     On December 17, 1999, Plaintiff was given a copy of the December 16, 1999, misbehavior report.  (Dkt. No. 42, ¶ 16; Dkt. No. 41, Ex. A, Attach. 2; Dkt. No. 46, ¶ 8 [Plf.'s Rule 7.1 Opp.].)

7.     On December 21, 1999, Plaintiff met "Inmate-Assistance Sgt. Crawford," and requested from him the interviews of nine potential defense witnesses (five Sing Sing C.F. inmates, including "M. Till 92A5893," and four Sing Sing C.F. Correction Officers, including "C.O. Hill 3-11 <sup>PM</sup> HBA") and all "Interdepartmental-Memorandums," "Unusual-Incident Memorandums," and "To-From Memorandums" pertaining to his alleged misconduct occurring on December 16, 1999.  (Dkt. No. 46, ¶ 9 [Plf.'s Rule 7.1 Opp.].)  Sgt. Crawford responded that there were no such "Interdepartmental-Memorandums," "Unusual-Incident Memorandums," and "To-From Memorandums" pertaining to his alleged misconduct occurring on December 16, 1999.  (*Id*. at ¶ 10.)[4]

8.     On December 22, 1999, Defendant Connolly transferred Plaintiff to Downstate C.F., in transit to Upstate C.F., as a result of the December 17, 1999, memorandum from Defendant Luther.  (Dkt. No. 42, ¶¶ 21, 25 [citing Dkt. No. 39, ¶ 10]; Dkt. No. 46, ¶¶ 7, 11 [Plf.'s Rule 7.1 Opp.].)[5]

---

[4]     I have viewed this factual assertion–which is not contradicted by Defendants' Rule 7.1 Statement–in the light most favorable to Plaintiff.

[5]     The parties disagree about whether the memorandum was a *partial* cause of Plaintiff's transfer to Upstate C.F. or the *sole* cause of that transfer.  (*Compare* Dkt. No. 42, ¶ 21

9.      On December 24, 1999, Plaintiff arrived at Upstate C.F.  (Dkt. No. 46 [Rule 7.1 Opp.], ¶ 12.)[6]  At Upstate C.F., Plaintiff continued to be confined in SHU.  (Dkt. No. 42, ¶ 47; Dkt. No. 46, ¶ 5 [Plf.'s Rule 7.1 Opp.]; Dkt. No. 46, ¶ 23 [Plf.'s Affid.].)

10.      On December 26, 1999, a Superintendent's Tier III Disciplinary Proceeding was commenced against Plaintiff at Upstate C.F. with respect to the December 16, 1999, misbehavior report, at which Defendant Bezio served as the designated Hearing Officer.  (Dkt. No. 42, ¶ 26; Dkt. No. 46, ¶ 13 [Plf.'s Rule 7.1 Opp.].)

11.      During the December 26, 1999, hearing, Plaintiff was advised that an extension had been granted to conduct the hearing within three days of Plaintiff's arrival at Upstate C.F., and to complete the hearing within ten days after that arrival; and Plaintiff raised no objection to the extension.  (Dkt. No. 42, ¶ 27; Dkt. No. 46, ¶¶ 13-14 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting this fact]; Dkt. No. 41, Ex. A at 37-38 [Plf.'s Depo.] [admitting this fact].)

12.      Also during the December 26, 1999, hearing, Plaintiff plead not guilty to the charges and provided testimony; then the hearing needed to be adjourned to determine the availability of witnesses.  (Dkt. No. 42, ¶ 27; Dkt. No. 46, ¶¶ 13-14 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting this fact].)

13.      The December 26, 1999, hearing was adjourned until January 3, 2000.  (Dkt.

---

[citing Dkt. No. 39, ¶ 10] *with* Dkt. No. 46, ¶ 7 [Plf.'s Rule 7.1 Opp.]; *but see* Dkt. No. 46, ¶ 11 [Plf.'s Rule 7.1 Opp.] [asserting that the misbehavior report was the cause of the transfer.)  I have viewed this factual dispute in the light most favorable to Plaintiff.

[6]      I have viewed this factual assertion–which Defendants do not controvert in their Rule 7.1 Statement–in the light most favorable to Plaintiff.

No. 42, ¶ 30; Dkt. No. 46, ¶ 14 [Plf.'s Rule 7.1 Opp.].)

14.     On December 30, 1999, Defendant Bezio heard confidential testimony from

Defendant Luther regarding Plaintiff's December 16, 1999, misbehavior report and the alleged

Sing Sing C.F.'s Y2K investigation.  (Dkt. No. 42, ¶ 29 [relying on Dkt. No. 37, ¶ 5, and Dkt.

No. 35, ¶ 8]; Dkt. No. 46 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting this fact].)[7]

15.     On January 3, 2000, Defendant Bezio continued Plaintiff's hearing and heard

testimony from one of the nine persons Plaintiff had requested to be interviewed on December

21, 1999): Sing Sing C.F. inmate "Till 92A5893."  (Dkt. No. 42, ¶ 30; Dkt. No. 46 [Plf.'s Rule

7.1 Opp.] [nowhere specifically controverting this fact].)[8]

16.     During the January 3, 2000, hearing, Plaintiff waived his right to call the

remaining eight persons whom he had identified as potential defense witnesses on December 21,

1999 (and, in addition, four of those persons--the Correction Officers--were unavailable to

testify).  (Dkt. No. 42, ¶ 32; Dkt. No. 46 [Plf.'s Rule 7.1 Opp.] [nowhere specifically

---

[7]     Although Plaintiff does not specifically controvert this fact in his Opposition to Defendants' Rule 7.1 Statement (Dkt. No. 46 [Plf.'s Rule 7.1 Opp.]), he does controvert--in his affidavit in support of his response to Defendants' motion for summary judgment--any assertion that Defendant Bezio relied on any *non-confidential* testimony of Defendant Luther (Dkt. No. 46, ¶ 16 [Plf.'s Affid.] ["neither the defendant D. Luther, nor the defendant K. McNamara testified as the record reflects"]).  As a result, I have limited the relevant finding of fact to include a reference to only Defendant Luther's *confidential* testimony of December 30, 1999.

[8]     Defendants' assertion in their Rule 7.1 Statement that Defendant Bezio also heard testimony from "plaintiff's witness[]" "CO Hill" appears unsubstantiated by the record.  This is because the hearing transcript suggests that Defendant Bezio heard testimony from the *wrong* Sing Sing C.F. Correction Officer Hill.  Specifically, the hearing transcript suggests that Defendant Bezio heard testimony from a male officer who worked from 3-11 p.m. on Side B of the Messhall, instead of the female officer who worked in the prison's "Gallery" on December 16, 1999, and who Plaintiff had intended to identify.  (Dkt. No. 37, Ex. D at 5, 10-13, 16 [Hrg. Trans.].)

controverting this fact]; Dkt. No. 37, Ex. D at 9-10, 12-13, 15-16 [Hrg. Trans.] [supporting this fact]; Dkt. No. 41, Ex. A at 31 [Plf.'s Depo.] [admitting this fact].)  He also waived his right to cross-examine Defendants Luther and McNamara as witnesses.  (Dkt. No. 37, Ex. D at 5-6, 14-16.)

17.     Also during the January 3, 2000, hearing, Plaintiff was advised of the December 16, 1999, memorandum from Defendant Luther to Defendant Connolly, regarding Plaintiff's alleged participation in the Y2K protest, which memorandum was read into the record.  (Dkt. No. 42, ¶ 31; Dkt. No. 46 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting this fact]; Dkt. No. 41, Ex. A at 37-38 [admitting this fact].)

18.     None of the other documents that Plaintiff had requested from Sgt. Crawford on December 21, 1999 (i.e., "Interdepartmental-Memorandums," "Unusual-Incident Memorandums," and "To-From Memorandums" pertaining to his alleged misconduct occurring on December 16, 1999), were available to Defendant Bezio at Plaintiff's disciplinary hearing. (Dkt. No. 42, ¶ 34; Dkt. No. 46 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting this fact].)

19.     At the conclusion of the January 3, 2000, hearing, Defendant Bezio found Plaintiff guilty of all charges against him.  (Dkt. No. 42, ¶ 33; Dkt. No. 46, ¶ 14 [Plf.'s Rule 7.1 Opp.].) Defendant Bezio stated that his finding was based on

> [t]he written report of Officer Luther, and the [confidential] testimony that through an ongoing investigation at Sing Sing including information from confidential sources and other sources indicating that you were threatening inmates with physical harm if they did not participate in a program work stoppage and state down at Sing Sing Correctional Facility [sic].

11

(Dkt. No. 42, ¶ 33; Dkt. No. 37, Ex. F at 2 [written decision]; Dkt. No. 46 [Plf.'s Rule 7.1 Opp.]

[nowhere specifically controverting these facts].)  Defendant Bezio also stated that "[t]he

credibility of this information is considered to be reliable since several sources were utilized."

(*Id.*)[9]  Finally, Defendant Bezio stated, "This disposition is imposed to impress on you that this

behavior is not acceptable and will not be tolerated.  Your actions have created a serious threat to

the safety, security and smooth operation of the facility."  (*Id.*)

      20.     By administrative appeal dated January 13, 2000, Plaintiff sought administrative

review of the January 3, 2000, disciplinary determination.  (Dkt. No. 42, ¶ 39; Dkt. No. 46, ¶ 15

[Plf.'s Rule 7.1 Opp.].)

      21.     In his appeal, Plaintiff made the following claims: (1) he had not received all the

written documents that he had requested on December 21, 1999; (2) the hearing was not timely

commenced within seven days, as required by New York State regulations; (3) the December 19,

1999, inmate misbehavior report lacked substantial credible evidence to support the charges; and

(4) Defendant Bezio should have personally interviewed the alleged confidential informants at

issue to independently determine their credibility.  (Dkt. No. 42, ¶ 40 [Defs.' Rule 7.1 Statement]

[erroneously citing Dkt. No. 42, ¶ 4, instead of the correct Dkt. No. 40, ¶ 4]; Dkt. No. 46 [Plf.'s

Rule 7.1 Opp.] [nowhere specifically controverting these facts].)

      22.     On February 22, 2000, Plaintiff's appeal was decided by Defendant Murphy, who

reduced Plaintiff's sentence from 18 to 12 months.  (Dkt. No. 42, ¶ 44; Dkt. No. 46, ¶ 15 [Plf.'s

Rule 7.1 Opp.].)  The stated reason for this modification was that the "nature of [the] offense

does nto [sic] warrant [the] penalty imposed."  (Dkt. No. 42, ¶¶ 41-44; Dkt. No. 46 [Plf.'s Rule

---

[9]     *See*, *supra*, note 7.

7.1 Opp.] [nowhere specifically controverting this fact]; Dkt. No. 46 [Plf.'s Affid., Ex. C].)[10]

23.     Upon further administrative review of Plaintiff's appeal, Plaintiff's guilty

determination was reversed on October 5, 2000.  (Dkt. No. 42, ¶ 45; Dkt. No. 46, ¶ 18 [Plf.'s

Rule 7.1 Opp.].)  The stated reason for this reversal was the following: "reversed after discussion

with Attorney General's Office due to failure of hearing officer to personally assess credibility of

confidential information."  (Dkt. No. 42, ¶ 45 [citing Dkt. No. 40, ¶ 8];[11] Dkt. No. 46 [Plf.'s Rule

7.1 Opp.] [nowhere specifically controverting this fact]; Dkt. No. 46 [Plf.'s Affid., Ex. D].)[12]

24.     As a result of the administrative reversal on October 5, 2000, Plaintiff was

released from SHU confinement after having served approximately 293-307 days, from

December 17, 1999, to approximately October 5-19, 2000. (Dkt. No. 42, ¶ 47; Dkt. No. 46 [Plf.'s

Rule 7.1 Opp.] [nowhere specifically controverting this fact].)

25.     While in confinement in SHU, Plaintiff was provided with the following: three

showers per week, one hour of exercise per day, unlimited legal visits, one non-legal visit per

week, counseling services, medical care, sick calls, limited access to books from the general

library and law library, limited access to legal assistance, mail except limited packages (no food

---

[10]     The parties dispute the specific grounds for Defendant Murphy's modification of Defendant Bezio's disciplinary hearing determination.  (*Compare* Dkt. No. 42, ¶¶ 41-44 *with* Dkt. No. 46, ¶¶ 15-16 [Plf.'s Rule 7.1 Opp.].)

[11]     I note that, although Defendant Murphy, in Paragraph 8 of his affidavit, refers to the document that supports this factual assertion by stating "after . . . consultation with the Attorney General's Office," he does not include the document in Exhibit E to his affidavit.  (Dkt. No. 40, ¶ 8 [citing Ex. E thereto].)

[12]     The parties dispute by whom this decision was rendered, and upon what specific grounds this decision was rendered.  (*Compare* Dkt. No. 42, ¶ 45 *with* Dkt. No. 46, ¶¶ 17-18 [Plf.'s Rule 7.1 Opp.].)

or clothing), limited commissary (no food or special-purchase items), and limited personal property (photographs and mail).  (Dkt. No. 42, ¶ 48; Dkt. No. 46 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting these facts].)[13]

26.     Plaintiff's disciplinary confinement at Upstate C.F. for approximately 300 days was not an atypical, significant deprivation compared to Plaintiff's expected confinement in the Department of Correctional Services.  (Dkt. No. 42, ¶ 53; Dkt. No. 46 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting these facts].)[14]

27.     On or about July 19, 2000, Plaintiff filed a petition in the matter of *Truesdale v. Ricks* in New York State Supreme Court, Franklin County (Index No. 2000-472), regarding the confiscation of a "chain with a Religious-medal stylized as a gold-rosary" while in SHU at Upstate C.F.; and on December 18, 2000, this petition was dismissed on the merits.  (Dkt. No. 42, ¶ 56; Dkt. No. 46 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting this fact]; Dkt. No. 1, ¶¶ 20-21 [alleging this fact]; Dkt. No. 41, Ex. A at 57-61 [Plf.'s Depo.] [admitting this fact]; Dkt. No. 41, Ex. A, Attach. 9 [decision and judgment in the matter]; Dkt. No. 46 [Plf.'s Affid., Ex. E]).[15]

---

[13]     (*See also* Dkt. No. 46, ¶ 23 [Plf.'s Affid.] [admitting some of these facts]; Dkt. No. 41, Ex. A at 48-54 [Plf.'s Depo.] [admitting some of these facts].)

[14]     (*See also* Dkt. No. 46 [Plf's Affid.], ¶ 23 [not specifically controverting this fact]; Dkt. No. 41, Ex. A at 48-54 [not specifically controverting this fact].)

[15]     As a point of clarification, this proceeding (Index No. 2000-472, Petition verified on July 19, 2000) should not be confused with a separate proceeding of a similar name (Index No. 2000-296, Petition verified on April 10, 2000).  (Dkt. No. 46, ¶¶ 17-18 [Plf.'s Rule 7.1 Opp.]; Dkt. No. 46, ¶¶ 20-21 [Plf.'s Affid.].)  This latter proceeding concerned Plaintiff's Tier III Superintendent's Hearing concluded at Upstate C.F. on January 3, 2000 (Dkt. No. 46 [Plf.'s Affid, Ex. H]), and was apparently dismissed as moot after Defendants in that proceeding notified the clerk's office on or about October 5, 2000, that the determination at issue had been

## II.    SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a fact question exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citation omitted).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Ross v. McGinnis*, 00 Civ. 0275, 2004 WL 1125177, *8 (W.D.N.Y. March 29, 2004) (internal quotations omitted).  A fact is material only if it would have some effect on the outcome of the suit.  *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

Imposed over this general burden-shifting framework is the generous perspective with

_____

administratively reversed (Dkt. No. 46 [Plf.'s Affid, Ex. E]).

which I must view a *pro se* plaintiff's pleadings.  "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the . . . responsibility of granting significant liberality in how *pro se* pleadings are construed."  *Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 460,  467 (S.D.N.Y. 1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir. 1989).  Here, because Plaintiff is proceeding *pro se,* I construe his complaint liberally so as to raise the strongest arguments that it suggests.  *Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir. 2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F. Supp. 794, 799 (W.D.N.Y. 1997) (motion for summary judgment in civil rights case).

However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, . . . [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual."  *Kadosh v. TRW, Inc.*, No. 91 Civ. 5080, 1994 WL 681763, *5 (S.D.N.Y. Dec. 5, 1994).  Thus, the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended."  *Stinson v. Sheriff's Dep't of Sullivan Cty.*, 499 F. Supp. 259, 262 (S.D.N.Y. 1980).[16]

---

[16]        In addition, I note that, because Plaintiff's complaint is not verified, I will not treat it as an affidavit.  *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") (citations omitted), *accord*, *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001).

III.     ANALYSIS

A.       Whether Defendants Are Entitled to Qualified Immunity

"In evaluating a summary judgment motion based on qualified immunity, [courts in the Second Circuit] perform a two-part test.  [They] ask first whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation." *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 1994) (citation omitted).  "If they do not, the plaintiff may not recover because he has suffered no wrong cognizable under § 1983." *Sira*, 380 F.3d at 69 (citation omitted).  "If the facts do establish a constitutional violation, however, we proceed to a second inquiry, asking 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id*. (citation omitted).  "If a reasonable officer would have believed that the challenged conduct was lawful at the time of the violation, then qualified immunity bars the claim." *Id*. (citations omitted).

1.       Defendants Bezio and Murphy

Liberally construed, Plaintiff's due process claim against Defendants Bezio and Murphy points to three alleged procedural deprivations: (1) non-disclosure of confidential evidence; (2) failure to call witnesses; and (3) insufficient evidence of misconduct.  *See Sira*, 380 F.3d at 69-70.[17]

_____

[17]     As stated above, Plaintiff alleges that Defendant Bezio arbitrarily adjudicated Plaintiff's disciplinary hearing, "fail[ed] to investigate into [sic] the facts surrounding the plaintiff's misbehavior report," "fail[ed] to call witnesses," and "fail[ed] to adjourn the disciplinary-hearing . . . to allow plaintiff an opportunity to review the requested Unusual-Incident Memorandum."  (Dkt. No. 1, ¶ 4.)  Similarly, Plaintiff alleges that Defendant Murphy "fail[ed] to investigate into [sic] the facts surrounding the plaintiff's Administrative-Appeal" and "failed to investigate into [sic] the plaintiff's claim, cause [sic] the plaintiff was confined on

17

### a.      Non-Disclosure of Confidential Evidence

Plaintiff alleges that Defendant Bezio "fail[ed] to adjourn the disciplinary-hearing . . . to allow plaintiff an opportunity to review the requested Unusual-Incident Memorandum." (Dkt. No. 1, ¶ 4.)  However, Plaintiff fails to meet part one of the two-part test described above in *Sira*; the facts of the case, even when viewed in the light most favorable to the Plaintiff, establish no such constitutional violation.  *Sira*, 380 F.3d at 69.

Indeed, the relevant record evidence indicates that, at approximately 2:47 p.m. on January 3, 2000, Defendant Bezio twice read to Plaintiff Defendant Luther's December 16, 1999, memorandum to Defendant Connolly–one time off the record and one time on the record.  (Dkt. No. 37, Ex. D at 13-15.)  Then, at approximately 2:50 p.m., Defendant Bezio adjourned the hearing for approximately fifteen minutes.  (*Id.*)  Plaintiff does not allege, nor does the record indicate, that he even asked Defendant Bezio to adjourn the hearing so that Plaintiff might further review Defendant Luther's December 16, 1999, memorandum.  (*Id.*; Dkt. No. 1, ¶¶ 4, 16-17.)

The only request that Plaintiff made for a copy of a memorandum at the hearing was when he requested a copy of a "U.I. Memorandum . . . pertaining to the investigation."  (Dkt. No. 37, Ex. D at 17-18.)  This request–which did not include a request to adjourn the hearing--came *after* Defendant Bezio had rendered his decision (which occurred after Plaintiff indicated he had no further information that he wanted to present).  (Dkt. No. 37, Ex. D at 17.)  Even if the denial of such a late and vague request could be a due process violation, Defendant Bezio responded

---

keep-lock status prior to the misconduct in question, and was not scheduled to be released until (9) days after the alleged resurrection [sic], and or protestation scheduled for January 1, 2000." (Dkt. No. 1, ¶¶ 5, 19.)

that there were no such U.I. memoranda (*id.* at 17-18) and the record supports that fact (Dkt. No.

46, ¶¶ 9-10 [Plf.'s Rule 7.1 Opp.]; Dkt. No. 41, Ex. A, Attach. 3).

Because "plaintiff . . . has suffered no wrong cognizable under § 1983," *Sira*, 380 F.3d at

69, I recommend that this claim against Defendant Bezio be dismissed on the basis of qualified

immunity.

### b.      Failure to Call Witnesses

Plaintiff alleges that Defendant Bezio "fail[ed] to call witnesses."  (Dkt. No. 1, ¶ 4.)

Again, Plaintiff fails to meet part one of the two-part test described above in *Sira*; the facts of the

case, even when viewed in the light most favorable to the Plaintiff, establish no constitutional

violation with regard to the calling of witnesses.  *Sira*, 380 F.3d at 69.

On January 3, 2000, Defendant Bezio heard testimony from one of Plaintiff's defense

witnesses, Sing Sing C.F. inmate "Till 92A5893."  (Dkt. No. 42, ¶ 30; Dkt. No. 46 [Plf.'s Rule

7.1 Opp.] [nowhere specifically controverting this fact].  Later during the hearing, Plaintiff

waived his right to call any other witnesses, including Defendant Luther.  (Dkt. No. 42, ¶ 32;

Dkt. No. 46 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting this fact]; Dkt. No. 37,

Ex. D at 5-6, 9-10, 12-16 [Hrg. Trans.] [supporting this fact]; Dkt. No. 41, Ex. A at 31 [Plf.'s

Depo.] [admitting this fact].)  *See Samuels v. Selsky*, 01 Civ. 8235, 2003 U.S. Dist. LEXIS

19162, *30 (S.D.N.Y. Oct. 24, 2003) (inmate waived right to call witness in disciplinary hearing

on misbehavior report stemming from Y2K Protest).

Because Plaintiff has suffered no wrong cognizable under § 1983, I recommend that this

claim against Defendant Bezio be dismissed on the basis of qualified immunity.

c.     **Insufficient Evidence of Misconduct**

Plaintiff's remaining due process claims point to a challenge to the sufficiency of the

evidence (insofar as he alleges that Defendants Bezio and Murphy ordered him disciplined

without some reliable evidence of misconduct).  Here, Plaintiff fails to meet part two of the two-

part test described above in *Sira*; a reasonable officer would have believed that the challenged

conduct was lawful at the time of the violation.  *Sira*, 380 F.3d at 69.

As the Second Circuit recently observed in a case factually similar to this one, "There has

been some ambiguity in our case law whether a hearing officer must make an independent

assessment of informant credibility to ensure that disclosures qualify as some reliable evidence,

or whether he can simply rely on the opinions of prison officials who have dealt with

informants."  *Sira*, 380 F.3d at 77 (citation omitted) (Section 1983 action based on prisoner's

confinement in SHU because of prisoner's alleged involvement in Y2K strike).  Specifically, the

Second Circuit in *Sir*a held:

> At the time of Sira's disciplinary proceedings [which
> concluded on February 8, 2000], the law of this circuit recognized a
> due process obligation to conduct some assessment of informant
> credibility to support prison discipline . . . but there was an
> ambiguity–which persisted at least until this court's decision in *Taylor
> v. Rodriguez*, 238 F.3d [188], 192-93 [2d Cir. 2001], and possibly
> thereafter, *see Gaston v. Coughlin*, 249 F.3d [156], 163 [2d Cir.
> 2001]–as to whether a hearing officer was required to conduct an
> independent assessment or whether he could rely on the opinion of
> another person. . . .
>
> Because this principle was not clearly established before today
> [August 17, 2004], it was objectively reasonable for defendants [who
> included plaintiff's hearing officer and appeals officer] to think that an
> independent assessment of the credibility of the confidential
> informants who proffered evidence against Sira, consistent with

20

> *Russell v. Scully*, 15 F.3d [219], 223 [2d Cir. 1993] [applying the law
> that was still controlling as of February 8, 2000], satisfied due process,
> and that Capt. Morton [the hearing officer] could, without further
> inquiry, rely on the third-party hearsay disclosed by those informants
> as some reliable evidence of Sira's participation in the Y2K strike.

*Sira*, 380 F.3d at 82 (citations omitted).

Here, the recognized law of this Circuit at the time of Plaintiff's disciplinary hearing

(January 3, 2000) and appeal (February 22, 2000), permitted Defendant Bezio to consider (1) the

specificity of the information, (2) the circumstances under which it was disclosed, and (3) the

degree to which it was corroborated by other evidence.  As the Second Circuit in *Sira* held:

> Any number of factors may inform a totality assessment of
> reliability. . . .  For example, . . . [w]here the original declarant's
> identity is unknown or not disclosed, the hearing officer may
> nevertheless consider such factors as the specificity of the information,
> the circumstances under which it was disclosed, and the degree to
> which it is corroborated by other evidence. . . .
>
> . . .
>
> [C]onsistency among hearsay statements may support a finding of
> reliability. . . .

*Sira*, 380 F.3d at 78-79 (citing four Supreme Court, and two Second Circuit cases, from before

1994).

In accordance with that law, Defendant Bezio clearly considered the degree to which the

information provided by each confidential informant was corroborated by the information

provided by the other confidential informants.[18]  In addition, he clearly considered the

circumstances under which the information was disclosed, i.e., the weeks preceding a planned

Y2K inmate strike at Sing Sing C.F.[19]  Finally, he appears to have considered the specific nature

of the information.[20]

       Because it was objectively reasonable at the time for Defendants Bezio and Murphy to

think that Defendant Bezio had adequately assessed the reliability of the confidential information

against Plaintiff, I recommend that the remaining due process claims against Defendants Bezio

and Murphy be dismissed on the basis of qualified immunity.

       In reaching this conclusion, I do not need to rely on the confidential documents submitted

by Defendants for *in camera* review.[21]  However, I am entitled to rely on those documents given

their reliability (as discussed above) and given their subject matter (regarding prison security).

*See Giakoumelos v. Coughlin*, 88 F.3d 56, 62-63 (2d Cir. 1996) (concluding that it was proper

---

[18]    As noted above, Defendant Bezio stated that, in reaching his finding of guilt, "The
credibility of [information indicating that you were threatening inmates with physical harm if
they did not participate in a program work stoppage and state down at Sing Sing C.F.] is
considered to be reliable *since several sources were utilized*."  (Dkt. No. 42, ¶ 33; Dkt. No. 37,
Ex. F at 2. [emphasis added].)

[19]    As noted above, Defendant Bezio further stated, in reaching his finding of guilt,
"Your actions have created a serious threat to the safety, security and smooth operation of the
facility."  (Dkt. No. 37, Ex. F at 2. [emphasis added].)

[20]    As noted above, Defendant Bezio's finding of guilt was based on "information
from confidential sources [obtained through an ongoing investigation at Sing Sing C.F.] . . .
indicating that you were threatening inmates with physical harm if they did not participate in a
program work stoppage and state down at Sing Sing Correctional Facility."  (Dkt. No. 42, ¶ 33;
Dkt. No. 37, Ex. F at 2.)

[21]    (Dkt. No. 34, Ex. A; Dkt. No. 35, Exs. A, E; Dkt. No. 37, Ex. E; Dkt. No. 38, Ex.
A; Dkt. No. 39, Ex. A [each exhibit submitted for *in camera* review].)

for district court, in deciding motion for summary judgment on Section 1983 claim, to rely on *in camera* submission because there was apparently "some examination of indicia relevant to [an informant's] credibility" and because the confidential document "shows that a substantial interest in the form of prison security is present in this case"), *accord*, *Edmonson v. Coughlin*, 21 F. Supp.2d 242, 252 (W.D.N.Y. 1998) (granting summary judgment to defendants in Section 1983 case), *Turner v. Grant*, No. 98-CV-706A, 2000 WL 362032, *6 (W.D.N.Y. March 29, 2000) (granting summary judgment to defendants in Section 1983 case).  Accordingly, I note that, if I did rely on those confidential documents, they would only strengthen my conclusion.[22]

## 2.    Defendants Luther and McNamara

Liberally construed, Plaintiff's due process claim against Defendants Luther and McNamara points to two alleged procedural deprivations: (1) filing a false misbehavior report against Plaintiff; and (2) retaliating against Plaintiff for exercising a constitutionally protected right.[23]

---

[22]    For example, the confidential hearing transcript demonstrates that Defendant Bezio was informed by Defendant Luther of, among other things, (1) the dates of four reports by confidential informants, (2) a general description of each of the four threats allegedly communicated by Plaintiff, (3) a specific identification of one of the informants, (4) a general identification of another such informant, and (5) the date Plaintiff was discovered to have possessed unauthorized organizational material in violation of DOCS Institutional Rules of Conduct 105.12.  (Dkt. No. 35, Ex. A at 3-4 [submitted for *in camera* review].)

[23]    As stated above, Plaintiff alleges that Defendant Luther filed, and Defendant McNamara co-signed, "a fabricated misbehavior-report [against plaintiff] in retaliation for the plaintiff['s] failing to cooperate in an alleged departmental-investigation" of "an alleged work . . . and program stoppage, supposively [sic] scheduled for January 1, 2000."  (Dkt. No. 1, ¶¶ 1-2, 6-8, 12-13.)

a.      **False Misbehavior Report**

Plaintiff alleges that Defendant Luther filed, and Defendant McNamara co-signed, "a fabricated misbehavior-report" against Plaintiff.  (Dkt. No. 1, ¶¶ 1-2, 6-8, 12-13.)  With regard to this allegation, Plaintiff fails to meet part one of the two-part test described above in *Sira*; the facts of the case, even when viewed in the light most favorable to Plaintiff, establish no such constitutional violation.  *Sira*, 380 F.3d at 69.

"[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report."  *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 [2d Cir. 1986]), *accord*, *Pittman v. Forte*, 01-CV-0100, 2002 WL 31309183, *5 (N.D.N.Y. July 11, 2002).  In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing."  *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986).  The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when it is made in "retaliation against the prisoner for exercising a constitutional right"–an issue addressed in the next section of this Report-Recommendation. *Boddie*, 105 F.3d at 862.

Even if it were a constitutional violation to file a false misbehavior report, absolutely no evidence exists in the record indicating that this misbehavior report was false.  As stated above, it is an undisputed material fact that, during the fall of 1999, while Plaintiff was an inmate at Sing Sing C.F., he was alleged by certain other inmates to be a leader of, and a participant in, a threatened inmate demonstration and strike scheduled to occur on January 1, 2000 ("Y2K

24

protest").  (Dkt. No. 42, ¶¶ 1, 13-14; Dkt. No. 46 [Plf.'s Rule 7.1 Opp. & Affid.] [nowhere

specifically controverting this fact].)  Given the nature of this confidential information, it

provided adequate grounds to support the misbehavior report.  *See Sira*, 380 F.3d at 78

(confidential information may be reliable based on "the specificity of the information, the

circumstances under which it was disclosed, and the degree to which it is corroborated by other

evidence").

      Therefore, I recommend that this claim against Defendants Luther and McNamara be

dismissed on the basis of qualified immunity.  Again, in reaching this conclusion, I do not need

to rely on the confidential documents submitted by Defendants for *in camera* review.  However, I

note that, if I did rely on those confidential documents, they would only strengthen my

conclusion.[24]

      **b.**      **Retaliation for Exercising Constitutionally Protected Right**

      Plaintiff alleges that Defendants Luther and McNamara filed the December 16, 1999,

misbehavior report against Plaintiff in retaliation for his failure "to cooperate in an alleged

departmental-investigation" of "an alleged work . . . and program stoppage, supposively [sic]

scheduled for January 1, 2000."  (Dkt. No. 1, ¶¶ 1-2, 6-8, 12-13.)  With regard to this allegation,

Plaintiff fails to meet the two-part test described above in *Sira*, 380 F.3d at 69.  The facts of the

case, even when viewed in the light most favorable to the Plaintiff, establish no such

---

[24]      For example, the Confidential Y2K Investigation Report reveals, among other
things, (1) the dates of five confidential reports concerning Plaintiff, (2) the precise identities of
two of the informants, (3) the general (and sometimes precise) identities of the objects of the
threats, (4) the nature of the threats (once using a quotation), and (5) the nature, and date of
possession, of Plaintiff's unauthorized organizational material in violation of Rule 105.12.  (Dkt.
No. 35, Ex. E at 13, 15, 16, 25, 29, 39 [submitted for *in camera* review].)

constitutional violation.  Even if the facts do establish such a constitutional violation, that

violation was not clearly established at the time of the violation.

Here, Plaintiff did not have a clearly established constitutionally protected right to refuse

to cooperate in an inner-prison investigation.  As the Second Circuit has held:

> [Defendant's] claim of bad faith motivation is that he was prosecuted
> because he declined to aid the government's investigation of offenses
> unrelated to his possession of cocaine.  We do not find this to be a
> constitutionally objectionable motivation.  Where there is probable
> cause for believing a defendant has committed a crime, his prosecution
> is not constitutionally barred because the prosecutor's selection of his,
> out of many other crimes to pursue, was precipitated by defendant's
> failure to cooperate with law enforcement officials.

*United States v. Ross*, 719 F.2d 615, 620 (2d Cir. 1983).[25]  This rule has been applied by District

Courts within the Second Circuit in Section 1983 cases.  *See, e.g.*, *Coleman v. City of New York*,

177 F. Supp.2d 151, 159 (S.D.N.Y. 2001) ("Refusal to cooperate with investigators is not

constitutionally protected activity and therefore, arresting and prosecuting an individual for a

crime after they refuse to cooperate" is not sufficient to give that individual a claim for malicious

abuse of process under 42 U.S.C. § 1983); *Labensky v. County of Nassau*, 6 F. Supp.2d 161, 167,

177-78 (E.D.N.Y. 1998) (neither selling cocaine nor refusing to cooperate with government

investigation is a recognized constitutionally protected activity in the context of either a

retaliation claim or an abuse of process claim, under 42 U.S.C. § 1983), *aff'd*, 1999 U.S. App.

_____

[25]    *See also Miller v. Superintendent*, 480 F. Supp. 858, 859 (S.D.N.Y. 1979)
(denying writ of *habeas corpus* premised on theory of selective prosecution where
petitioner–who had been arrested by DEA agents for trafficking cocaine–was prosecuted under
harsh state law, rather than lenient federal law, because he refused to cooperate with the
government investigation), *accord*, *Donaldson v. Dalsheim*, 508 F. Supp. 294, 298 (S.D.N.Y.
1981).

LEXIS 4241 (2d Cir. March 15, 1999) (unpublished opinion).  Thus, regardless of Plaintiff's

reason for not cooperating with Defendants Luther and McNamara in a prison investigation, he

did not have a constitutionally protected right to refuse to participate in that investigation.[26]

Therefore, I recommend that this claim against Defendants Luther and McNamara be

dismissed on the basis of qualified immunity.

### 3.    Defendant Connolly

Liberally construed, Plaintiff's due process claims against Defendant Connolly point to

two procedural deprivations: (1) transferring Plaintiff in retaliation for the exercise of a

constitutionally protected right; and (2) transferring Plaintiff without investigating the reasons for

the transfer.[27]

---

[26]    It bears noting that Plaintiff also appears to assert that the constitutionally
protected right that he was exercising was the right to file a grievance.  Specifically, Plaintiff
asserts that, on December 16, 1999, following his visit from Defendants Luther and McNamara,
Plaintiff "attempted to write a grievance, and a formal-complaint in regards to the earlier
conversation with the defendant D. Luther, and the Defendant J. McNamara."  (Dkt. No. 46, ¶ 6
[Plf.'s Rule 7.1 Opp.].)  The problem with this assertion, apart from the fact that it is wholly
unsupported by any corroborating factual evidence, is that Plaintiff does not connect his
attempted grievance / complaint with the filing of a misbehavior report by Defendants Luther and
McNamara.  In particular, Plaintiff offers no evidence, or even an allegation, that Defendants
Luther and McNamara (1) knew Plaintiff was attempting to write a grievance / complaint and (2)
that they filed the misbehavior report in retaliation therefor.  Plaintiff's assertion, therefore, is
conclusory and immaterial.
        Finally, I cannot read Plaintiff's papers as asserting that the constitutionally protected
right that he was exercising had anything to do with free speech with regard to the Y2K strike –
especially since Plaintiff repeatedly alleges, and asserts, that the Y2K strike was merely "alleged"
or "supposed," and that he "did not know of [such] an alleged [strike]."  (Dkt. No. 1, ¶¶ 6-8, 10,
12, 19; Dkt. No. 46, ¶ 4 [Plf.'s Rule 7.1 Opp.]; Dkt. No. 46, ¶¶ 4-5 [Plf.'s Affid.].)

[27]    As stated above, Plaintiff alleges that Defendant Connolly "transfer[red] the
plaintiff [to Upstate Correctional Facility's Punitive Segregation Unit] in retaliation . . . for
[plaintiff's] failing to cooperate in an alleged departmental-investigation" and failed to
"investigat[e] the facts surrounding the fabricated misbehavior-report."  (Dkt. No. 1, ¶¶ 3, 11, 14-

### a.      Retaliation for Exercising Constitutionally Protected Right

Plaintiff alleges that Defendant Connolly transferred Plaintiff to Upstate C.F. "in

retaliation . . . for [plaintiff's] failing to cooperate in an alleged departmental-investigation"

(Dkt. No. 1, ¶¶ 3, 11, 15.)  For the same reasons as stated above in Section III.A.2.b. of this

Report-Recommendation, Plaintiff did not have a clearly established constitutionally protected

right to refuse to cooperate in an inner-prison investigation.

### b.      Unjustified Transfer

To the extent Plaintiff is alleging that Defendant Connolly's transfer order was based on a

false or "fabricated" misbehavior report, that allegation should be dismissed for the same reasons

as stated above in Section III.A.2.a. of this Report-Recommendation.

The remainder of Plaintiff's due process claim against Defendant Connolly is that

Defendant Connolly failed to investigate the purported reasons for Plaintiff's transfer.  With

regard to this allegation, Plaintiff fails to meet part one of the two-part test described above in

*Sira*; the facts of the case, even when viewed in the light most favorable to Plaintiff, establish no

such constitutional violation.  *Sira*, 380 F.3d at 69.

"A prisoner has no constitutional right to be incarcerated in a particular institution; he

may be transferred for any reason or for no reason at all"–even where conditions in one prison

are "more disagreeable" or the prison has "more severe rules."  *Murphy v. Bradley*, 03-CV-714,

2004 U.S. Dist. LEXIS 1074, *6-7 (D. Conn. Jan. 16, 2004) (granting motion to dismiss claim

brought by inmate for negligent transfer under 42 U.S.C. § 1983) (citing, among numerous other

15.)

28

cases, *Meachum v. Fano*, 427 U.S. 215, 225-28 [1976]).  *See also Meriwether v. Coughlin*, 879

F.2d 1037, 1047 (2d Cir.1989) ("It is well established that the transfer of a prisoner from one

institution to another does not invoke the protection of the Due Process Clause."), *accord*, *Burke*

*v. McCoy*, 96-CV-0984, 1997 WL 610650, *5 (N.D.N.Y. Oct. 1, 1997) (Pooler, D.J.).

Even if negligent transfer were a recognized cause of action, absolutely no facts would

exist in the record before me to support it.  Indeed, Defendant Luther's December 16, 1999,

memorandum to Defendant Connolly – which the Court may properly rely on since it was

disclosed to Plaintiff at his January 3, 2000, disciplinary hearing – provided sufficient reason to

transfer Plaintiff.[28]  Because the memorandum referred to relatively specific information

corroborated by several different confidential sources, under circumstances that were reasonably

perceived as serious to the operation of Sing Sing C.F., Defendant Connolly was justified in

relying on that memorandum.  *Sira*, 380 F.3d at 78 (confidential information may be reliable

based on "the specificity of the information, the circumstances under which it was disclosed, and

the degree to which it is corroborated by other evidence").

Finally, I note that, had Plaintiff alleged that Defendants Luther, McNamara and Connolly

violated his due process rights because the Misbehavior Report failed to notify him of the

charges against him sufficiently for him to defend himself, summary judgment based upon

qualified immunity on that precise claim would probably not be available to those Defendants.

However, Plaintiff did not so allege or assert (in his complaint, his Rule 7.1 Opposition, or his

affidavit in support of his opposition papers), and I cannot even liberally construe his complaint

---

[28]      (Dkt. No. 39, Ex. D; Dkt. No. 35, Ex. D; Dkt. No. 37, Ex. D at 14.)

or opposition papers as presenting such an allegation against these three Defendants – especially at this late stage in the proceeding, when they have already answered the complaint and the parties have conducted discovery.[29]

Accordingly, I recommend that Plaintiff's claims against all Defendants be dismissed on the ground of qualified immunity.

**B.      Whether Plaintiff Has Stated a First Amendment Claim for Denial of Access to the Courts**

As described above, Plaintiff alleges that, while in Upstate C.F.'s punitive segregation unit, he lost a legal case in New York State Supreme Court, Franklin County (Index No. 2000-472), because (1) his "legal-notes" and "legal-drafts" were confiscated and/or destroyed, and (2) his access to "legal-research materials" and "legal-assistance" was reduced.  (Dkt. No. 1, ¶¶ 20-21.)

Defendants argue that Plaintiff has failed to state a First Amendment claim for denial of access to the courts, because (1) no facts exist demonstrating that any of the Defendants were involved in the alleged confiscation of Plaintiff's legal materials or in the alleged denial of Plaintiff's access to legal materials or legal assistance, (2) indeed, Plaintiff had enough access to the courts to file a petition with New York State, Supreme Court (Index No. 2000-472), and litigate that case to a decision on the merits, and (3) Plaintiff has failed to exhaust his administrative remedies on this claim since he never filed any grievance or complaint regarding it.  (Dkt. No. 43 at 14-15.)

---

[29]      *See*, *supra*, note 1.

30

Liberally construed, Plaintiff's response is that (1) he lost Supreme Court case No. 2000-472 (regarding the confiscation of a religious medallion while in SHU) solely because he was in Upstate C.F.'s punitive segregation unit, which was the result of Defendants Luther and McNamara's "fabricated" misbehavior report and Defendants McNamara, Bezio and Murphy's reliance on that report, and (2) Defendants "evaded" an adverse result in Plaintiff's other case in New York State Supreme Court (Index No. 2000-296) (regarding the Tier III Superintendent's Hearing at issue in this case) by requesting dismissal of that case because of the administrative reversal of the outcome of Plaintiff's disciplinary hearing.  (Dkt. No. 46 at 9-10.)

I agree with Defendants.  An inmate has a First Amendment right to "meaningful" access to the courts.  *Lewis v. Casey*, 518 U.S. 343, 351 (1996).  For an inmate to establish the infringement of this right, he must show that Defendant caused him "actual injury," i,e., that a "nonfrivolous legal claim" has been "frustrated" or "impeded."  *Lewis*, 518 U.S. at 351-53; *Monsky v. Moraghan*, 127 F.3d 243, 246-47 (2d Cir. 1997).  Here, Plaintiff has not adduced any facts whatsoever supporting the proposition that Defendants in this matter caused him to lose his New York State Supreme Court case (Index No. 2000-296).

Plaintiff's argument about the dismissal of Supreme Court case No. 2000-427 (regarding the confiscation of a religious medallion while in SHU) is unpersuasive for two reasons.  First, the argument assumed that Defendants relied on a "fabricated" misbehavior report; and I have already decided, for purposes of this motion, that the misbehavior report in question was not "fabricated," but was based on reliable confidential information.  (*See*, *supra*, Part III.A.2.a.)  Second, even if the misbehavior report had been "fabricated," the alleged link between Defendants' reliance on that report and Plaintiff's loss of his court case is too attenuated to

establish liability,[30] especially since absolutely no facts exist indicating that Plaintiff lost the case due to an inability to prepare or file any papers, or an inability to obtain outcome-changing but unavailable legal research; rather, all facts indicate that Plaintiff lost the case on the merits, after filing a reply and supplemental reply (Dkt. No. 41, Ex. A, Attach. 9; *see Lewis*, 518 U.S. at 351 (citing examples of "shortcomings" in prison system that a plaintiff must allege).[31]

Similarly, Plaintiff's argument about Supreme Court case No. 2000-296 (regarding Plaintiff's Tier III Superintendent's Hearing) is unpersuasive for two reasons.  First, none of the Defendants in this matter were Defendants in that matter, and thus any "evasive" conduct by the Defendant in that matter (Thomas Ricks, Superintendent of Upstate C.F.) cannot be attributable to the Defendants in this matter.  (Dkt. No. 46 Plf.'s Affid, Exs. E, H].)  Second, even liberally construed, Plaintiff's complaint did not allege that Plaintiff was denied access to the courts as a result of the dismissal of Supreme Court case No. 2000-296; therefore, this argument regards a claim that is not before this Court.  (Dkt. No. 1, ¶¶ 20-21.)

Accordingly, I recommend that Plaintiff's First Amendment claim for denial of access to the courts be dismissed as against all Defendants.

---

[30]      *Cf. Williams*, 781 F.2d at 324 ("The filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing.").

[31]      In reaching this conclusion, I note that, as described above, it is undisputed that, while in confinement in SHU at Upstate C.F., Plaintiff was provided with, among other things, unlimited legal visits, one non-legal visit per week, limited access to books from the general library and law library, and limited access to legal assistance.  (Dkt. No. 42, ¶ 48; Dkt. No. 46 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting these facts]; Dkt. No. 46, ¶ 23 [Plf.'s Affid.] [admitting some of these facts]; Dkt. No. 41, Ex. A at 48-53 [admitting some of these facts].)

### C.        Whether Plaintiff Has Stated a Claim for Property Deprivation

As described above, Plaintiff alleges that Defendants violated his due process rights in

that his "legal-notes" and "legal-drafts" were confiscated and/or destroyed while in punitive

confinement at Upstate C.F.  (Dkt. No. 1, ¶ 20.)[32]  Defendants argue that Plaintiffs fails to state a

claim for property deprivation because (1) no evidence exists that any of the Defendants was

personally involved in the alleged confiscation of his legal materials, and (2) in any event,

Plaintiff was afforded due process in that the state provided him a meaningful post-deprivation

remedy for this alleged deprivation, which he chose not to pursue.  (Dkt. No. 43 at 7, 15.)

Plaintiff does not respond to this argument.  (Dkt. No. 46.)

Again, I agree with Defendants.  "[A]n unauthorized intentional [or negligent]

deprivation of property by a state employee does not constitute a violation of the procedural

requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful

postdeprivation remedy for the loss is available."  *Hudson v. Palmer*, 468 U.S. 517, 533 (1984);

7 N.Y. Comp. Codes R. & Regs. tit 7, §§ 1700.1-1700.10 (providing procedure for inmates to

file personal property claims).

Here, absolutely no facts exist indicating that Plaintiff was frustrated or impeded from

pursuing this claim.  Indeed, the record reveals that Plaintiff was able to file both a grievance and

a New York State Supreme Court case (Index No. 2000-427) regarding the deprivation of his

---

[32]        Although Plaintiff's complaint references the dismissal of his New York State
Supreme Court case (Index No. 2000-427), which regarded the confiscation of his religious
medallion while in SHU at Upstate C.F., he references that dismissal only to frame a First
Amendment violation for denial of access to the courts.  (Dkt. No. 1, ¶ 20.)  Therefore, even
liberally construing Plaintiff's complaint, I cannot construe that complaint as alleging that
Defendants deprived Plaintiff of his religious medallion.

religious medallion, and litigate that claim to a resolution on the merits.  (*See*, *e.g.*, Dkt. No. 41, Ex. A, Attach. 9 [decision and judgment in the matter]).  Moreover, even if Plaintiff was frustrated or impeded from pursuing a claim regarding the deprivation of his legal papers, no evidence exists indicating that Defendants *caused* that impediment.  *Cf. Williams*, 781 F.2d at 324 ("The filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing.").

Accordingly, I recommend that Plaintiff's due process claim for property deprivation be dismissed as against all Defendants.

### D.     Whether Plaintiff Has Stated a Claim for Retaliation

#### 1.     As Against Defendants Luther and McNamara

As described above, Plaintiff alleges that Defendants Luther and McNamara filed the December 16, 1999, misbehavior report against Plaintiff in retaliation for his failure "to cooperate in an alleged departmental-investigation" of "an alleged work . . . and program stoppage, supposively [sic] scheduled for January 1, 2000."  (Dkt. No. 1, ¶¶ 1-2, 6-8, 12-13.) However, for reasons also described above (*see*, *supra*, Part III.A.2.b.), Plaintiff did not have a constitutionally protected right to refuse to cooperate in an inner-prison investigation.  *Ross*, 719 F.2d at 620; *Coleman*, 177 F. Supp.2d at 159; *Labensky*, 6 F. Supp.2d at 167, 177-78, *aff'd*, 1999 U.S. App. LEXIS 4241.

Defendants' argument presumes that Plaintiff was indeed engaging in a constitutionally protected activity.  (Dkt. No. 43 at 7-10.)  Operating under that assumption, Defendants argue that Plaintiff's exercise of that constitutionally protected right was not a substantial or motivating

factor in Defendants Luther and McNamara's actions against Plaintiff; rather, they would have issued the misbehavior report and notified Defendant Connolly of the misbehavior report even absent Plaintiff's protected conduct.  (*Id.*)  Fortunately, I do not have to reach this issue, which I suspect would be somewhat thorny given that Defendants do not specifically assert this fact in their Rule 7.1 Statement (*see*, *e.g.*, Dkt. No. 42, ¶¶ 15, 18, 21-23), nor do Defendants Luther and McNamara specifically assert this fact in their affidavits in support of Defendants' motion for summary judgment (*see*, *e.g.*, Dkt. No. 35, ¶¶ 5-7, 9; Dkt. No. 38, ¶¶ 5-8).

### 2.    As Against Defendant Connolly

As described above, Plaintiff alleges that Defendant Connolly transferred Plaintiff to Upstate C.F. "in retaliation . . . for [plaintiff's] failing to cooperate in an alleged departmental-investigation"  (Dkt. No. 1, ¶¶ 3, 11, 15.)  For the same reasons as stated above in Part III.A.2.b. of this Report-Recommendation, Plaintiff did not have a constitutionally protected right to refuse to cooperate in an inner-prison investigation.  Therefore, and for the same reasons as stated above in Part III.D.1. of this Report-Recommendation, I need not reach Defendants' argument that Defendant Connolly would have transferred Plaintiff even absent Plaintiff's protected conduct. (Dkt. No. 43 at 7-10.)

I note, however, that I would probably be persuaded by Defendants' argument, given that Plaintiff failed to specifically allege that Defendant Connolly *knew* that the misbehavior report in question was issued in retaliation for Plaintiff's exercise of a constitutionally protected right. (Dkt. No. 1, ¶¶ 3, 11, 15.)  At most, Plaintiff has alleged against Defendant Connolly a claim of negligent transfer, which–for reasons described above in Part III.A.3.b. of this Report-

Recommendation–is not a valid cause of action, and which, in any event, is wholly unsupported by the facts of this case.

Accordingly, I recommend that Plaintiff's due process claim against Defendants Luther, McNamara and Connolly for retaliation be dismissed.

### E.    Whether, with Regard to Plaintiff's Confinement in a Special Housing Unit, He Has a Protected Liberty Interest Under the Fourteenth Amendment

As described above, Plaintiff alleges that, while in Upstate C.F.'s punitive segregation unit, he experienced "reduced access to legal-research materials, and legal-assistance, reduced access to rehabilitative, [sic] reduced access to educational, and work-incentive programs, together and coupled with no access to telephones, and packages."  (Dkt. No. 1, ¶ 21.)[33]

Defendants argue that this claim should be dismissed because Plaintiff's confinement in SHU for approximately 300 days was not an "atypical and significant hardship on [plaintiff] in relation to the ordinary incidents of prison life" sufficient to involve the protections of the due process clause of the Fourteenth Amendment, under *Sandin v. Connor*, 515 U.S. 472 (1995). (Dkt. No. 43 at 10-12.)  Defendants further argue that any segregation of one year or less affords no protected liberty interest absent extraordinary circumstances, citing *Polanco v. Allan*, 1996 U.S. Dist. LEXIS 6329 (N.D.N.Y. May 6, 1996).

Plaintiff responds by arguing that his confinement in SHU (which he asserts involved several deprivations not alleged in his complaint) did indeed constitute an "atypical and

---

[33]    I assume, without deciding, that Plaintiff's minimal allegations regarding his confinement state a claim upon which relief can be granted, under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and the liberal pleadings permitted by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

significant hardship" as compared to ordinary prison life, or at least that there exists a reasonable dispute of material fact on the issue for a jury. (Dkt. No. 46 at 7-8.)

I agree with Plaintiff, although for reasons somewhat different than those he offers. The *Polanco* case cited by Defendants is not entirely instructive because the *duration* of confinement is only one inquiry into whether Plaintiff's due process rights were violated; the other inquiry regards the *conditions* of confinement. *See Giano v. Selsky*, 37 F. Supp.2d 162, 167, 169 (N.D.N.Y. 1999) (citing cases). Here, it is an undisputed fact, for purposes of this motion, that, while in confinement in SHU, Plaintiff's conditions of confinement were the following: three showers per week, one hour of exercise per day, unlimited legal visits, one non-legal visit per week, counseling services, medical care, sick calls, limited access to books from the general library and law library, limited access to legal assistance, mail except limited packages (no food or clothing), limited commissary (no food or special-purchase items), and limited personal property (photographs and mail).[34] These conditions appear to be the "normal conditions of SHU confinement in New York." *See Colon v. Howard*, 215 F.3d 227, 230 (2d Cir. 2000). (*See also* Dkt. No. 36, ¶¶ 10-16 [Affid. of Donald Selsky].)

But the conditions of Plaintiff's confinement are not evaluated in a vacuum; rather, those conditions must be compared to "the ordinary incidents of prison life." Here, it is an undisputed fact, for purposes of this motion, that "[p]laintiff's disciplinary confinement at Upstate Correctional Facility for approximately 300 days was not an atypical, significant deprivation

---

[34]     (Dkt. No. 42, ¶ 48; Dkt. No. 46 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting these facts]; Dkt. No. 46, ¶ 23 [Plf.'s Affid.] [admitting some of these facts]; Dkt. No. 41, Ex. A at 48-53 [Plf.'s Depo.] [admitting some of these facts].)

compared to plaintiff's expected confinement in the Department of Correctional Services." (Dkt. No. 42, ¶ 53; *see* Dkt. No. 46 [Plf.'s Rule 7.1 Opp.] [nowhere specifically controverting fact]; Dkt. No. 46 [Plf.'s Affid.] [nowhere specifically controverting fact].) However, this undisputed fact is not dispositive of the issue at hand, since (1) this undisputed fact appears to refer to only the duration of confinement, not the conditions of it, and, in any event, (2) the ultimate question is how Plaintiff's confinement in SHU compared to "the ordinary incidents of prison life," not merely how that confinement compared to Plaintiff's *expectation* of those incidents.

The Second Circuit has held that "[c]onfinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon*, 215 F.3d at 231. Granted, the Second Circuit went on to suggest that it would have been persuaded by evidence submitted by Defendants showing that such confinement "did not compare unfavorably" with the ordinary incidents of prison life, *see id.*; and here, Defendants have submitted such evidence (Dkt. No. 36, ¶¶ 23-35 [Affid. of Donald Selsky]). However, I must conclude that Plaintiff's deposition testimony creates a reasonable dispute of material fact on this issue. (Dkt. No. 41, Ex. A at 48-54 [testifying that, prior to his confinement in SHU, Plaintiff had greater access to "the law library, legal assistance, . . . the phone, . . . work incentive programs, packages, . . . commissary, . . . counseling services . . . [and] personal property"].)[35]

Therefore, for purposes of this summary judgment motion, I find that, with regard to

---

[35]   *Cf. Vasquez v. Coughlin*, 2 F. Supp.2d 255, 259-260 (N.D.N.Y. 1998) (granting summary judgment for defendants after relying on description of treatment of inmates in SHU compared with those in general inmate population, submitted in affidavit of DOCS official, only because plaintiff did not dispute the facts in that affidavit with facts of his own).

Plaintiff's confinement in a special housing unit at Upstate C.F., he had a protected liberty interest under the Fourteenth Amendment.  However, I find that Defendants did not violate that protected liberty interest, for reasons stated in the following section.

**F.      Whether There Was a Due Process Violation at Plaintiff's Disciplinary Hearing or During His Administrative Appeal**

**1.      Disciplinary Hearing**

As described above, Plaintiff alleges that Defendant Bezio arbitrarily adjudicated Plaintiff's disciplinary hearing, "fail[ed] to investigate into [sic] the facts surrounding the plaintiff's misbehavior report," "fail[ed] to call witnesses," and "fail[ed] to adjourn the disciplinary-hearing . . . to allow plaintiff an opportunity to review the requested Unusual-Incident Memorandum."  (Dkt. No. 1, ¶¶ 4, 16-17.)

Defendants argue that this claim should be dismissed due to the following reasons: (1) no evidence exists demonstrating that Plaintiff was denied witnesses or documents at the hearing; (2) Plaintiff has waived any claim with respect to witnesses; (3) Plaintiff has waived any claim with respect to the timeliness of the hearing and, in any event, an extension of the hearing was properly granted; (4) the Sing Sing C.F. Y2K Investigation Report was not available until after the hearing and, in any event, that confidential report would not have been available to Plaintiff due to prison safety and security concerns; (5) the confidential hearing testimony of Defendant Luther, and the confidential information on which it was based, was reliable; and (6) to the extent that Plaintiff was denied any exculpatory evidence, any error in that denial was harmless.  (Dkt. No. 43 at 12-14.)

Plaintiff's response, at its core, contains the following two arguments: (1) Defendant Bezio's disciplinary finding was not supported by any evidence, especially considering that Plaintiff was on keep-lock status at the time the alleged threats were made; and (2) Defendant Bezio either withheld relevant information from Plaintiff or failed to inquire into the basis of Plaintiff's defense.  (Dkt. No. 46 at 4-7.)

I agree with Defendants.  The parties' arguments stray somewhat from the pertinent issue at hand, namely, the legal sufficiency of, or lack of any factual substantiation for, Plaintiff's four allegations regarding Defendant Bezio.  (Dkt. No. 1, ¶ 4.)  Taking those allegations in order, first, no evidence exists indicating that Defendant Bezio "arbitrarily" adjudicated Plaintiff's disciplinary hearing; despite the administrative reversal of Defendant Bezio's hearing decision, the hearing decision was supported by evidence that could have reasonably been believed to be "reliable" at the time of the hearing, as described above in Part III.A.1.c.  Second, no evidence exists indicating that Defendant Bezio failed to review[36] the facts surrounding Plaintiff's

---

[36]    Plaintiff's due process allegations against Defendant Bezio seem to assume that Defendant Bezio had a duty to "investigate" the case, as if he had some obligation to independently unearth otherwise-undiscovered facts.  (Dkt. No. 1, ¶ 4.)  Such a characterization of a disciplinary hearing officer's duty is inaccurate; rather, that duty is more properly characterized as a duty to "review" the evidence, and in certain circumstances identify defense witnesses.  *Compare Kingsley v. Bureau of Prisons*, 937 F.2d 26, 31 (2d Cir. 1991) (hearing officer had duty to identify defense witness's name, only because defendant had a compelling need for the witness, the witness's identity was readily available to hearing officer, and defendant was new to the prison) *with Martin v. Mitchell*, 92-CV-0716, 1995 U.S. Dist. LEXIS 19006, *10-12 (N.D.N.Y. Nov. 24, 1995) (disciplinary hearing officer had no duty to "investigate" the identity of a Correction Officer identified merely as "Budd"), *and Hampton v. McGinnis*, 89-CV-6344, 1992 U.S. Dist. LEXIS 15696, *6 (S.D.N.Y.  Oct. 15, 1992) (disciplinary hearing officer had no duty to "investigate" defendant's assault claim).  Indeed, a prison official who has "investigated" the underlying charges in a disciplinary hearing would be prohibited from acting as a hearing officer, due to a conflict of interest.  *See Silva v. Sanford*, 91-CV-1776, 1994 U.S. Dist. LEXIS 11568, *38-41 (S.D.N.Y. Aug. 17, 1994) (citing cases).

misbehavior report (nor does any evidence exist indicating that Plaintiff was denied access to any available documents at the hearing, as described above in Part III.A.1.a.). Third, no evidence exists indicating that Plaintiff was denied any witnesses at his disciplinary hearing and, in any event, Plaintiff waived any claim with respect to those witnesses, as described above in Part III.A.1.b. Finally, no evidence exists indicating that Defendant Bezio failed to adjourn the disciplinary hearing at any point when he was obligated to do so, or even that Plaintiff requested such an adjournment, as described above in Part III.A.1.a. In any event, Defendants are correct that "an inmate is not deprived of due process where an administrative appeal has cured a hearing's procedural defects." *Russell v. Scully*, No. 92-2057, 1993 WL 188677, *3 (2d Cir. June 4, 1993) (citing cases).

## 2.     Administrative Appeal

As described above, Plaintiff alleges that Defendant Murphy "fail[ed] to investigate into [sic] the facts surrounding the plaintiff's Administrative-Appeal" and "failed to investigate into [sic] the plaintiff's claim, cause [sic] the plaintiff was confined on keep-lock status prior to the misconduct in question, and was not scheduled to be released until (9) days after the alleged resurrection [sic], and or protestation scheduled for January 1, 2000." (Dkt. No. 1, ¶¶ 5, 18-19, 22.)

Defendants' arguments regarding Plaintiff's due process allegations against Defendant Murphy are similar to their arguments regarding Plaintiff's due process allegations against Defendant Bezio, with the addition of three arguments: (1) administrative review is not one of the due process rights afforded to inmates under the Fourteenth Amendment; (2) to the extent

41

there were any due process errors, those errors may be, and indeed were, corrected on appeal; and (3) Defendant Murphy sufficiently reviewed the record and correctly found the hearing decision to be supported by reliable evidence.  (Dkt. No. 43 at 12-14.)

Plaintiff's response to Defendants' arguments regarding the Murphy allegations is similar to his response to Defendants' arguments regarding the Bezio allegations.  (Dkt. No. 46 at 4-7.)

Not surprisingly, therefore, I agree with Defendants, although for reasons different than those they offer.  I find that, for purposes of this motion, Defendant Murphy satisfied any duty to review[37] the "facts surrounding the plaintiff's Administrative-Appeal" and Plaintiff's defense that he was on keep-lock status at the time the alleged threats were made.  I have found no facts in the record indicating that Defendant Murphy failed to satisfy that duty.  The fact that Defendant Bezio's hearing decision was ultimately administratively reversed only shows that any procedural errors by Defendant Murphy were cured.  *Russell*, 1993 WL 188677 at *3.

Accordingly, I recommend that Plaintiff's due process claims against Defendants Bezio and Murphy be dismissed.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 33) be **GRANTED** in its entirety; and that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed

---

[37]     For reasons previously stated, Plaintiff's characterization of Defendant Murphy's duty on appeal (Dkt. No. 1, ¶ 1, ¶¶ 5, 19) is inaccurate.  *See*, *supra*, note 36.

with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d

Cir. 1993) (citing *Small v. Sec'y of Health and Human Svcs.*, 892 F.2d 15 [2d Cir. 1989]); 28

U.S.C. § 636(b); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: April 28, 2005
         Syracuse, New York

George H. Lowe
United States Magistrate Judge